OPINION OF THE COURT
SHWARTZ, Circuit Judge.
Michelle Moody sued the Atlantic City Board of Education (“Board”) for sexual harassment and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e-2(a)(1), 3(a), and the New Jersey Law Against Discrimination (“NJLAD”), N.J. Stat. Ann. §§ 10:5-12(a), (d). The District Court granted summary judgment to the Board, finding that the alleged harasser, Maurice Marshall, was not Moody’s supervisor. Because Marshall was empowered to determine whether Moody worked at New York Avenue School, which had a direct impact on her pay, and the record reveals no one else provided supervision, the District Court erred in concluding Marshall was not’ her supervisor. In addition, because there are disputed facts concerning whether Moody sustained a tangible employment action, and because the Board’s defense rests in part on the resolution of this issue, the District Court prematurely considered the availability of the Ellerth/Faragher defense. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Therefore, we will vacate and remand.
I[1]
In November 2011, the Board approved Moody’s hiring as a substitute custodian. As a substitute custodian, Moody filled in for full-time custodians but was not guaranteed any work. During the 2011-2012 school year, Moody was rarely scheduled to work and in the summer of 2012, she asked a Board employee how to obtain more work. The employee suggested that Moody introduce herself to the custodial foremen at the schools within the district. Each school had a custodial foreman who was delegated the authority to select which substitute custodians worked at the school.
Around September 2012, Moody introduced herself to approximately ten custodial foremen at different schools, including Marshall, the custodial foreman at New York Avenue School. By October 2012, Marshall was assigning Moody regular work. Moody also met the custodial foreman at Pennsylvania Avenue School and occasionally worked there. The Board concedes that when Moody was working at New York Avenue School, Marshall was acting in a supervisory capacity. Oral Argument at 18:07-18:30, Moody v. Atl. City Bd. of Educ. (3d Cir. July 12, 2017) (No. 16-4373), http://www.ca3.uscourts.gov/oral-argument-recordings (counsel for the Board stating that “it’s reasonable that if Moody was called in by Marshall that day, and Marshall was the foreman at the school in charge of all the custodians, I *211 think that it’s reasonable that during that day he could be considered [to be] in a supervisory position”). The record does not indicate that anyone other than Marshall supervised Moody’s work at New York Avenue School.
Moody claims that, around the end of October 2012, Marshall began making sexual comments to her and told her that he would assign her more hours if she performed sexual favors for him. According to Moody, Marshall “would often be very touch feely and grab [Moody’s] breasts or buttocks at the work place.” App. 123. Moody testified that: (1) in early November 2012, Marshall called Moody into his office and tried to remove her shirt; (2) in late November, Marshall called Moody into his office, where Moody found Marshall sitting unclothed on his office chair; and (3) in December 2012, Marshall grabbed Moody, pulled her towards him, and stated “[y]ou want more hours?” App. 216. On December 27, 2012, Marshall and Moody exchanged the following text messages:
[Marshall:] U playing
[Marshall:] Well
[Marshall:] Ok ill hit u when I go to work
[Moody:] In the am?
[Marshall:] No tonight my other job am I getting all three holes
[Moody:] No the hell u not
[Marshall:] How’s penn treating u
[Marshall:] U got steady work and that’s where the contracts going to be at
[Marshall:] I got u
App. 127-28. Moody interpreted these text messages to mean that Marshall could help her obtain a full-time contract to- work at Pennsylvania Avenue School if she acquiesced to his sexual advances. Moody said that Marshall came to Moody’s house that evening and told her that she would get an employment contract if she had sex with him. Marshall grabbed her and began to kiss her. Moody “felt that [her] job had been threatened,” and therefore she gave into Marshall’s unwelcome advances and reluctantly had sex with him. App. 217. In the days following this encounter, Moody told Marshall that it would never happen again. .
Despite her rebuke, Moody received assignments at New York Avenue School on December 30, 2012 and January 4, 7, 8,11, 14, 15, and 22, 2013. Moody, however, believed that Marshall treated her differently after she rejected him. On January 23, 2013, for example, Moody went to New York Avenue School to pick up her paycheck from Marshall. At the time, Marshall was playing ping pong and would not retrieve the check for her until he finished the game. Moody also noticed that Michelle McArthur, .a new female substitute custodian, appeared to be receiving hours instead of her.[2] Further, another custodian told Moody that she was on Marshall’s “shit list.”[3] App. 119. Later that day, Marshall and Moody exchanged the following text messages:
[Moody:] U don’t gotta act like that towards me, I understand your upset at me but, outside of that Im a good worker, but, Its cool
[Marshall:] Wt are u talking about, I’m not into the drama
[Moody:] Just making sure Im not on ya so call “shit list”
*212 [Marshall:] U are but not like that I won’t stop u from getting I don’t play-games like that
App. 131. Moody believed that Marshall delayed retrieving her paycheck and reduced her hours because she had rejected his sexual advances, and she exchanged more text messages with Marshall to that effect on January 29, 2013. In these exchanges, Marshall seemed to deny having sex with Moody and asserted that Moody just said this because she was angry that he delayed retrieving her check. Moody retorted “I have all the text messages and my parents saw u when u came to my house.” App. 135.[4]
On February 4, 2013, Moody met with Sherry Yahn, the Board’s Assistant Superintendent, and informed Yahn that Marshall had been sexually harassing her. Yahn immediately took Moody to Human Resources (“HR”) to file a written complaint. HR subsequently began an investigation into Moody’s complaint and ordered Moody and Marshall not to have contact with each other during the investigation.[5]
HR’s March 2013 report of its investigation states that it interviewed Moody, Marshall, and eight custodians at New York Avenue School, but it did not reach á conclusion as to whether Moody was sexually harassed. Later that month, Moody filed a charge of discrimination with the Equal Employment Opportunity Commission.
The Board hired an outside law firm to conduct an independent investigation of Moody’s claims. After considering the HR report and conducting further interviews, the firm issued a report in July 2013 finding that Moody was not subjected to sexual harassment or discrimination. The Board informed Moody of these findings but nonetheless ordered Marshall and Moody to avoid any contact with each other.
Moody filed a complaint against the Board in the United States District Court for the District of New Jersey, raising claims of sexual harassment and retaliation in violation of Title VII and the NJLAD. Moody- alleged that the Board subjected her to sexual harassment through Marshall and retaliated against her for complaining about the harassment.[6] The District Court found that Marshall was not Moody’s supervisor and so the Board was not liable for his actions and, in any event, Moody did not show she suffered a tangible employment action. The District Court also found that because the Board took prompt action upon receipt of her complaint, it was entitled to the Ellerth/Far-agher affirmative defense. As a result, the District Court granted summary judgment in the Board’s favor. Moody appeals.
II[7]
We must decide whether the District Court erred by granting the Board’s *213 motion for summary judgment on Moody’s sexual harassment and retaliation claims. Our review of the District Court’s order granting summary judgment is plenary. Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). We apply the same standard as the District Court, viewing facts and making all reasonable inferences in the non-movant’s fayor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). A dispute “is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the- non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law.” Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make “a sufficient showing on an essential element of her case with respect to which she has the burden of proof.” Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Ill
A
Title VII and the NJLAD prohibit sexual harassment because it is a form of sex discrimination.[8] Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Lehmann v. Toys ‘R’ Us, Inc., 132 N.J. 587,626 A.2d 445, 452 (1993).[9] At oral argument, Moody stated that she is proceeding based upon a hostile work environment theory of sexual harassment.[10]
“To succeed on a hostile work environment claim [against the employer], the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person -in like circumstances, and 5) the existence of re-spondeat superior liability.” Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted); see also Lehmann, 626 A.2d at 453 (setting forth elements of a hostile work environment claim under the NJLAD).[11]
*214 Viewed in a light most favorable to her, Moody’s testimony about Marshall’s sexual actions and his comments about her body supports her claim that Marshall’s harassment occurred “because of [Moody’s] sex.” See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990) (“The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.”), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072; Lehmann, 626 A.2d at 454 (“When the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied. Thus when a plaintiff alleges that she has been subjected to sexual touchings or comments ... she has established that the harassment occurred because of her sex.”).
Viewed from the same perspective, Marshall’s conduct toward Moody, if proven, could be viewed by a reasonable juror as sufficiently “severe or pervasive” to support a hostile work environment claim. The “severe or pervasive” standard requires conduct that is sufficient “to alter the conditions of [the employee’s] employment and create an abusive working environment.”[12] Meritor, 477 U.S. at 67, 106 *215 S.Ct. 2399 (citation and internal quotation marks omitted). The question of “whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citation and internal quotation marks omitted).
Moody testified that, in addition to the times Marshall made sexually charged comments to her and grabbed her, Marshall once called her into his office and, when she entered, she found Marshall sitting naked on a chair. On another occasion, Marshall allegedly called Moody into his office and attempted to take her shirt off. At another point, Marshall sent her a text message stating “am I getting all three holes” and thereafter showed up at her house uninvited and pressured her into having sex with him by threatening her job. App. 127; cf. Jin v. Metro. Life Ins. Co., 310 F.3d 84, 94 (2d Cir. 2002) (“Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace.”). Although Marshall denies this conduct, we must view the facts in Moody’s favor. Hugh, 418 F.3d at 266-67. From this perspective, Moody’s account provides sufficient evidence upon which a reasonable juror could conclude that she experienced severe harassment, and their different accounts of these events present disputed material facts for a jury to resolve.
Moody’s account, if proven, could also provide a basis from which a reasonable juror could infer that Marshall’s conduct detrimentally affected Moody and would have affected a reasonable person in similar circumstances. Moody’s testimony suggests that she “subjectively perceive[d] the environment to be abusive.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). She testified that she believed Marshall expected to trade sexual favors for work and would seek retribution if she did not accede to his demands, and that he made her uncomfortable when he grabbed her and when he invited her to his office while he was unclothed. A reasonable person would likely also find such an environment “objectively hostile or abusive,” id., because it is one where a perceived supervisor expected his subordinate to give sexual favors in exchange for work, touched a subordinate against her wishes, made sexual comments to her, and exposed himself to her.
Finally, since Moody sued the Board and not Marshall, we must consider whether there are disputed facts concerning the existence of respondeat superior liability. On this point, we look to agency principles and the Restatement (Second) of Agency § 219 for guidance.[13] Ellerth, 524 *216 U.S. at 755-58, 118-S.Ct. 2257. In discussing § 219(1), the Ellerth Court observed that “[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment” but that, under § 219(2), “[i]n limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment.” Id. at 757-58, 118 S.Ct. 2257. Most relevant here, under § 219(2)(d), a master may be subject to liability even when employees act outside the scope of their employment if they were “aided in accomplishing the tort by the. existence of the agency relation.” Restatement (Second) of Agency § 219(2)(d) (Am. Law Inst. 1958).
This “aided-in-the-accomplishment rule” can impose liability on employers for a supervisor’s harassment. Liability here is predicated upon the idea that the supervisor is able to take an employment action only because he or she is the employer’s agent. Thus, “[w]hen a supervisor takes a tangible employment action” against a subordinate, the employer is vicariously liable because “the injury could not have been inflicted absent the agency relation.” Vance v. Ball State Univ., — U.S. -, 133 S.Ct. 2434, 2442, 186 L.Ed.2d 565 (2013) (citations and internal quotation marks omitted); see also id. (not-tag that a supervisor, as opposed' to a coworker, is in a sense always “aided by the agency relation” because “a supervisor’s power and authority invests his or her harassing conduct with a particular threatening character”). An employee is a supervisor for purposes of respondeat superior liability pursuant to Title VII if he or she is “empowered by the employer to take tangible employment actions.” Id. at 2439. A “tangible employment action” is “a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Ellerth, 624 U.S. at 761, 118 S.Ct. 2257.
There is no dispute that Marshall had the authority to decide whether to summon Moody to work at New York Avenue School 'because the Board granted him that authority as the custodial foreman. In fact, a Board employee suggested that Moody introduce herself to the custodial foremen as a means to obtain work assignments.[14] The authority to assign work is a' “tangible employment action” because it is a decision that can “inflict[] direct economic harm,” Ellerth, 524 U.S. at 762, 118 S.Ct. 2257, by ’“causing a significant change in benefits,” Vance, 133 S.Ct. at *217 2443. Given Marshall's power as a custodial foreman to even allow Moody to work, he could effect a “tangible employment action” by setting her hours and hence her pay. See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) (“A reduction in an employee’s hours, which reduces the employee’s take-home pay, qualifies as a tangible employment action.”), Marshall therefore had more than the .power. to direct Moody’s work or to have her stay beyond her shift or cover an extra shift. He had the authority to determine whether Moody worked at all if he needed a substitute custodian. Marshall could avoid calling Moody into work if he chose; and in fact he did so on multiple occasions when a substitute custodian was needed at New York Avenue School. See App. 168, 171 (suggesting that Marshall called Michelle Mc-Arthur in to work on January 23-25 and 28-29 instead of Moody). Marshall had the authority to cause a significant change in Moody’s benefits by assigning her no hours, thereby eliminating her take-home pay.' Thus, Marshall’s power to impact Moody’s earnings is sufficient to qualify him as a supervisor. See Cotton, 434 F.3d at 1231. Moreover, the Board conceded that while Moody was working at New York Avenue School, Marshall was acting in a supervisory capacity. Oral Argument at 18:07-18:30, Moody v. Atl. City Bd. of Educ. (3d Cir. July 12, 2017) (No.. 16-4373), http://www.ca3.uscourts.gov/oral-argument-recordings. Furthermore, no one else was identified in the record as having authority over Moody, other than the custodial foremen who could assign her work at their schools. While other foremen also could have arguably been Moody’s supervisors, Marshall assigned Moody over-.70% of her hours from October 2012 through February 2013.[15]
In summary, the record here supports the conclusion that Marshall was Moody’s supervisor because (a) the Board empowered him as the-custodial foreman to select from the list of substitute custodians who could actually work at New York Avenue School;[16] (b) the Board conceded that while Moody was on school premises, Marshall served iñ a supervisory role; (c) the record identifies no other person who was present full time or even sporadically on the school’s premises, or anywhere for that matter, who served as Moody’s supervisor; and (d) since Moody’s primary benefit from her employment was hourly compensation, and since Marshall controlled 70% of her hours, his decision to assign or withhold hours significantly affected her pay.[17] Thus, the record shows that Mar *218 shall was Moody’s supervisor, as defined under Vance, for whose conduct the Board may be hable.[18]
B
The Board argues that, even if Marshall was Moody’s supervisor and he harassed her, it would not be liable for his conduct pursuant to the EIlerth/Faragher defense. An employer can establish an affirmative defense to liability for a supervisor’s creation of a hostile work environment by showing “(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided.” Vance, 133 S.Ct. at 2442 (citing Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Ellerth, 524 U.S. at 765, 118 S.Ct. 2257). Under Federal Rule of Civil Procedure 8(c), “[i]n responding to a pleading, a party must affirmatively state any ... affirmative defense.” Fed.. R. Civ. P. 8(c)(1); see also Ellerth, 524 U.S. at 765, 118 S.Ct. 2257 (describing the defense as an “affirmative defense” and citing to Rule 8(c)). “An affirmative defense which is neither pleaded as required by [R]ule 8(c) nor made the subject of an appropriate motion under [R]ule 12(b) is waived.” Sys. Inc. v. Bridge Elecs. Co., 335 F.2d 465, 466 (3d Cir. 1964). However, an affirmative defense generally “need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of [Federal] Rule [of Civil Procedure] 8 by its bare assertion.” Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 361 (8th Cir. 1997) (citation and internal quotation marks omitted). While the Board’s answer did not explicitly identify the EIlerth/Faragher defense, the answer states that the Board “at all times, acted in good faith and based on reasonable and rational decision-making and procedure delegated to it under the laws of the State of New Jersey.” Def. App. 60. This statement is sufficient to raise the assertion that the Board acted with “reasonable care” under the first prong of the El-lerth/Faragher analysis regarding promptly taking corrective action. The Board’s answer also states that Moody’s damages were barred by her “failure to mitigate.” Def. App. 60. Under the second prong of the EIlerth/Faragher analysis, a plaintiffs *219 failure to take advantage of preventative or corrective opportunities at a school could be characterized as a “failure to mitigate” damages. See Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1258 (11th Cir. 2014) (finding that pleading of “failure to mitigate” sufficiently, raised an El-lerth/Faragher defense). Accordingly, while it would have been better to more explicitly assert the Ellerth/Faragher defense, the Board’s answer provides sufficient notice of its intent to raise it. See Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002) (“The purpose of requiring the defendant to plead available affirmative defenses in [its] answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.”).
The Board’s brief in support of its motion for summary judgment also alludes to the Ellerth/Faragher defense, even though it is not mentioned by name. Its brief emphasizes that Moody did not report the harassment until February 4, 2013, and the Board immediately took action and conducted a thorough investigation upon receiving her complaint. These arguments address the Ellerth/Faragher analysis by claiming that Moody failed to take advantage of corrective opportunities when she did not timely report the harassment, and asserting that the Board acted reasonably by immediately conducting a thorough investigation into Moody’s complaint. Therefore, the Board did not waive its El-lerth/Faragher defense.
The Ellerth/Faragher defense, however, is available only where the plaintiff did not experience a “tangible employment action.” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257. Moody argues that she experienced a tangible employment action by receiving reduced hours from Marshall. There are many ways Moody’s work hours could be viewed. For example, Moody worked more hours for Marshall in the three pay periods before she rejected his advances than in the three pay periods after she rejected them. Compare App. 156, 159, 162 (showing that Moody worked a total of 94 hours at New York Avenue School in the pay periods of November 19-30, December 3-14, and December 17-28), with App. 165, 168, 171 (showing that Moody worked a total of 62.5 hours at New York Avenue School in the pay periods of December 31-January 11, January 14-25, and January 28-February 8). A reasonable juror could conclude that Marshall gave Moody hours to entice her to accede to his sexual demands and then reduced her hours after she rejected him. On the other hand, Moody received about the same number of hours at New York Avenue School in January 2013, after she rejected Marshall, as she did in December 2012, before she rejected Marshall. Compare App. 156, 159, 162, 165 (showing that Moody worked a total of 54.5 hours at New York Avenue School in December 2012), with App. 165, 168, 171 (showing that Moody worked a total of 56 hours at New York Avenue School in January 2013). A reasonable juror could therefore also conclude that Marshall did not reduce Moody’s hours at all following her rejection of his advances. Because Moody’s pay records are central to the question of whether she suffered a tangible employment action and could reasonably be viewed in two ways, there is a disputed issue of material fact as to whether she suffered a tangible employment action. Because the Ellerth/Faragher defense is available only where there is no tangible employment action, Ellerth, 524 U.S. at 765, 118 S.Ct. 2257, a jury must first decide whether there was such an action. If the jury concludes that there was not, the District Court or jury (if there are disputed material facts with respect to the El- *220 lerth/Faragher defense) may then decide whether the Board avoids liability based on the defense. Because there are disputed facts concerning whether Marshall took a tangible employment action against Moody, and the answer to that question dictates whether the Board may invoke the Ellerth/Faragher defense, we will vacate the District Court’s order granting summary judgment in the Board’s favor on Moody’s hostile work environment claim.
IV
Title VII and the NJLAD make it unlawful for an employer to retaliate against an employee who complains about employment discrimination.[19] To establish a prima facie case of retaliation under Title VII, a plaintiff must show “(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee’s protected activity; and (3) a causal connection between the employee’s protected activity and the employer’s adverse action.” Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (citation and internal quotation marks omitted); Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 660 A.2d 505, 508 (1995) (reciting similar elements for NJLAD retaliation).
As to the first element of the pri-ma facie case, Moody filed a written complaint about Marshall’s alleged sexual harassment with the Board on February 4, 2013, and the Board concedes that this action constitutes an “activity protected by Title' VIL” App. 56; see Daniels, 776 F.3d at 193 (noting that protected activity in-eludes “informal protests of discriminatory employment practices, including making complaints to management” (citations and internal quotation marks omitted)).
As to the second element, we must determine whether Moody suffered a materially adverse action. In this context, a materially adverse action is one that would have “dissuaded a reasonable worker from making or supporting a charge of discrimination.” Id., at 195 (citations. and internal quotation marks omitted). Here, after Moody filed her February 2013 complaint of sexual harassment, she experienced a drop in the hours she was assigned. In the four months preceding her complaint, Moody worked a total of 360 hours. See App. 181-82 (showing that Moody was assigned to work 62 hours in October 2012, 115.5 hours in November 2012,126.5 hours in December 2012, and 56 hours in January 2013). By comparison, in the four months following her complaint, Moody worked a total of 115.5 hours. See App. 182 (showing that Moody was assigned to work 36 hours in February- 2013, 23 hours in March 2013, 32.5 hours in April 2013, and 24 hours in May 2013). Therefore, Moody’s working hours declined, three-fold in the months following- her complaint as compared to the months preceding her complaint. Viewing these facts in a light most favorable to the non-movant, a reasonable employee could view this reduction of work hours, and the resulting decreased pay, as sufficient to discourage him or her from filing a sexual harassment complaint. Therefore, Moody satisfies the second element of the prima facie case.
*221 Finally, as-to whether there is a causal connection between the plaintiffs protected activity and the employer’s adverse action, a.court considers a “broad array- of evidence,” including.[1] whether there is an “unusually suggestive”'temporal proximity between the protected activity and adverse action. Daniels, 776 F.3d at 196 (citations and internal quotation marks omitted). An inference of “unduly suggestive” temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action, LeBoon v. Lancaster Jewish Cmty. Ctr. Ass’n, 503 F.3d 217, 233 (3d Cir. 2007). In this case, :as noted above, Moody’s working- hours declined immediately following the filing of her complaint and never recovered. In fact, in the two pay periods directly following the filing of her complaint, Moody was not assigned any hours. See App. 173-77 (showing no hours worked for Moody during the pay periods of February 11-22 and February 25-March 8). The close temporal connection between Moody’s complaint and the reduction in her hours is “unduly suggestive” and sufficient to provide prima facie evidence of a causal connection.
Accordingly, Moody has established a prima facie case-of retaliation under Title VII and the NJLAD.[20]
V
For the foregoing reasons, we will var-éate the judgment of the District Court and remand for further proceedings.

. Because we are reviewing a summary judgment record, we view the facts and make all reasonable inferences in Moody’s favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).

. The payroll records in fact show that, in January 2013, Moody received no hours at New York Avenue School after January 22 and that McArthur received work on January 23, 24, 25, 28, and 29.

. The custodian to whom Moody attributed this comment denied making it.

. During his deposition, Marshall denied sexually harassing Moody. In addition, eight custodians at New York Avenue School stated that they had not witnessed any inappropriate behavior on the part of Marshall or Moody.

. Moody’s hours decreased in the months after she complained about Marshall. Compare App. 181-82 (showing that Moody was assigned to work 62 hours in October 2012, 115,5 hours in November 2012, 126.5 hours in December 2012, and 56 hours in January 2013), with App. 182 (showing that Moody was assigned to work 36 hours in February 2013, 23 hours in March 2013, 32.5 hours in April 2013, and 24 hours in May 2013).

. Moody initially alleged that the Board retaliated against her by transferring her children to different schools, but she has since abandoned that theory.

. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

. Under Title VII, it is unlawful for an employer “to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s ... sex.” 42 U.S.C. § 2000e-2(a)(1). Under the NJLAD, it is unlawful "[f]or an employer, because of the ... sex ... of any individual ... to discriminate against such individual in compensation' or in terms, conditions or privileges of employment.” N.J. Stat. Ann. § 10:5-12(a).

. The New Jersey Supreme Court “has' frequently looked to federal precedent governing Title VII” to interpret and apply the NJLAD. Lehmann v. Toys ‘R’ Us, Inc., 132 N.J. 587, 626 A.2d 445, 452 (1993).

. A plaintiff may also bring a sexual harassment claim pursuant to a- "quid pro quo” theory. See Lehmann, 626 A.2d at 452 (explaining that quid pro quo sexual harassment "involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences”).

. In Farrell v. Planters Lifesavers Co., we left open the question of whether the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), would apply in the context of a quid pro quo sexual harassment claim, and we have not yet spoken on wheth *214 er the framework would apply to hostile work environment claims. 206 F.3d 271, 286 n.11 (3d Cir. 2000). Under McDonnell Douglas, once a plaintiff makes out a prima facie case of discrimination that resulted in an adverse employment action, the burden shifts to the defendant to show there was a legitimate nondiscriminatory reason for the adverse employment action. 411 U.S. at 802, 93 S.Ct. 1817. If the defendant can articulate such a reason, the plaintiff is afforded an opportunity to show the reason is pretextual. Id at 804-05, 93 S.Ct. 1817. Some of our sister circuits have concluded that the McDonnell Douglas framework does not apply in hostile work environment sexual harassment cases. See Pollard v. E.I. DuPont de Nemours Co., 213 F.3d 933, 943 (6th Cir. 2000) (explaining that the McDonnell Douglas framework cannot apply to a hostile work environment sexual harassment claim because "there is no legitimate justification for such an environment, and thus recourse to the McDonnell Douglas test is not warranted”), rev'd on other grounds, 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001); Martin v. Nannie & The Newborns, Inc., 3 F.3d 1410, 1417 n.8 (10th Cir. 1993) (concluding that the plaintiff's failure to rebut the employer's legitimate, nondiscriminatory reason for her termination was not relevant to a hostile work environment claim), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); see also Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 510-11 (11th Cir. 2000) (concluding that the district court erred in applying the McDonnell Douglas framework to non-retaliation sexual harassment claims, and explaining that the Ellerth Court made no mention of McDonnell Douglas and that sexual harassment cases have developed separately from other claims under Title VII). We agree that the burden-shifting framework is inapplicable here because, as the Pollard court explained, there can be no legitimate justification for a hostile work environment. 213 F.3d at 943. Therefore, we will not apply the McDonnell Douglas burden-shifting framework to Moody’s hostile work environment claim.

. The “severe or pervasive” standard is disjunctive and so "a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions.” Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010) (emphasis omitted); see also Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017) (clarifying that “[t]he correct standard is severe or pervasive” and explaining that "severity and pervasiveness are alternative possibilities; some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive” (citation and internal quotation marks omitted)); Lehmann, 626 A.2d at 455 (explaining that the severe or pervasive test is "disjunctive” and "[t]he required showing of severity or seriousness of *215 the harassing conduct varies inversely with the pervasiveness or frequency of the conduct” (citation and internal quotation marks omitted)).

. Section 219 of the Restatement provides:
(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a non-delegable duty of the master, or
*216 (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
Restatement (Second) of Agency § 219 (Am, Law Inst, 1958).

. While the District Court and the Board are correct that Marshall was only one of multiple custodial foremen within the school district who could have assigned Moody work, we are aware of no authority indicating that an employee cannot have multiple supervisors. Such a rule would lead to the absurd result that employees with multiple managers have no “supervisors" for the purposes of Title VII and the NJLAD, Moreover, the fact that Marshall was unable to hire or fire employees is not dispositive of whether he is a supervisor. As we have explained, an employee capable of effecting a "tangible employment action” is a supervisor, Vance v. Ball State Univ., — U.S. -, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013), and the concept of a tangible employment action extends beyond hiring and firing to decisions "causing a significant change in benefits,” Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), such as reduced work hours for an hourly worker, Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006).

. The Dissent suggests that, by considering the payroll records, the Majority is reverting to a pre-Vance rule for determining who is a supervisor. This is not the case. We are simply using the records to corroborate the conclusion that. Marshall controlled a sizeable amount of Moody’s work, and hence her compensation—the benefit she received from her employment.

. This is not to say that every employee tasked with creating a work schedule is a supervisor for Title VII and NJLAD purposes. See Vance, 133 S.Ct. at 2448 ("The ability to direct another employee's tasks is simply not sufficient.”). The Dissent cites to not prece-dential opinions of other circuits discussing nonsupervisoiy employees, but we are bound by our precedent and our custom not to rely on not precedential opinions of our Court and, by extension, those of our sister circuits. See I.O.P. 5.7.

.The Dissent says that the fact Moody was not entitled to any work, and hence-not entitled to any benefits, means that she could not experience a change- to her benefits: This implies that Moody would not be protected from ' sexual harassment no matter who was her supervisor. The law,- however, protects workers from sexual harassment. Thus, while Moody was not guaranteed any work hours, and by extension had no guaranteed benefits, she, like other hourly workers covered by *218 Title VII and the NJLAD, is guaranteed to be protected from sexual harassment by her supervisor.

. As is apparent, the Majority has not ignored Vance but in fact heeded its instructions. Moreover, even under the Dissent’s articulation of Vance's requirements, the outcome is the same: Marshall was Moody’s supervisor, The Dissent poses one of Vance's considerations for determining whether a person is a supervisor as follows: “Could Marshall ... make a decision that caused a significant change in [Moody’s] benefits?” Dissent at 223. The answer to this question is unequivocally yes. Marshall had the authority from the Board to determine whether Moody worked at all at New York Avenue School and this authority was not vague or "ill-defined.” Vance, 133 S.Ct. at 2443.
Moreover, contrary to the Dissent's characterization, the Majority is not simply relying on the fact that Marshall could assign Moody work hours. Marshall was not a mere scheduler, assigning hours among those who were in a pool of employees. Marshall controlled whether Moody worked at New York Avenue School at all. Furthermore, the record does not reflect that anyone else was Moody's supervisor. The Dissent challenges this statement by citing to Moody’s deposition testimony where she was asked whether she discussed Marshall’s behavior with anyone such as the principal or Marshall's supervisor. This exchange, however, does not indicate that either of these people supervised her pursuant to Vance. Moreover, while the Dissent suggests that those who hired Moody qualify as her supervisors under Vance, even if that were so, this does not mean Marshall was not also her supervisor.

. Title VII makes it unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter,' or because [the employee] has made a charge, testified, assisted, or participated in any manner iii an investigation, proceeding, or hearing under this subchapter.” 42 U.S.C. § 2000e-3(a). Similarly, under the NJLAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act.” N.J. Stat. Ann. § 10:5-12(d),

. While there may be a legitimate, nondiscriminatory reason for the reduction in Moody’s hours, neither the parties- nor the District Court addressed it because the District Court concluded that Moody did not establish a prima facie case of retaliation. See Daniels, 776 F.3d at 193 (stating that after the plaintiff makes out her prima facie case, “the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action”), The District Court may address this issue on remand, and we express no opinion on its proper resolution.

. I do not take issue with the Majority’s judgment on Moody’s retaliation claim.