**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3102
_____

DONTAE L. JOHNSON,
                              Appellant

v.

CAPT. KEITH L. STITH,
individually and in his capacity as a
Police Detective for the Office of the
Hudson County Prosecutor;
DET. MIGUEL MATOS,
individually and in his official capacity
as a Police Detective for the Hudson
County Prosecutor; JOHN DOES 1-25 (fictitious names)
individually and in their official capacity as Agents of the
Office of the Hudson County Prosecutor
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. Action No. 2-14-cv-05032)
District Judge: Honorable Madeline Cox Arleo
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
_____

Before:  GREENAWAY, JR., RENDELL, and FUENTES, *Circuit Judges*

(Opinion Filed: May 24, 2018)

_____

OPINION[*]

_____

GREENAWAY, JR., *Circuit Judge*.

Appellant Dontae L. Johnson appeals the District Court's order granting summary

judgment to Appellees, Hudson County officers Keith L. Stith and Miguel Matos, on his

claim for malicious prosecution under 42 U.S.C. § 1983 and the New Jersey Civil Rights

Act ("NJCRA"). Johnson now argues that the District Court erred in concluding that

Appellees, who were involved in the investigation and prosecution of the jury tampering

case in which he was acquitted, had probable cause to arrest him. He also asserts that

there exists genuine disputes of material facts precluding the grant of summary judgment

because the District Court made improper factual determinations. He further contends

that the District Court applied the incorrect standard for summary judgment by drawing

inferences in favor of the movants. We will affirm the District Court's order.

## I.    Facts & Procedural Background

This appeal arises from Johnson's criminal trial for jury tampering, in which he

was acquitted. The jury tampering charges stemmed from an underlying murder trial,

where Johnson's uncle, Quaheem Johnson ("Quaheem"), stood trial in Hudson County

Superior Court. After being acquitted of the jury tampering charges, Johnson brought

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

2

claims for malicious prosecution against two officers involved in the investigation and prosecution of the case and a claim under the NJCRA.

In April 2011, Quaheem stood trial for murder in the Superior Court of New Jersey. During trial, a juror named Tiffany Thorpe sent the trial judge a note stating that she felt "very uncomfortable" with the fact that, at least in part, someone in Quaheem's family knew where she resided. During a private interview with the trial judge, Thorpe indicated that she was "scared for [her] family and [her]self." App. 196. She indicated that she felt "uncomfortable" because there was a girl in court that "lives around the corner from" her house that was staring at her (in court). App. 198. Thorpe also said that, the day before, she had visited a McDonald's restaurant and heard "the guys from [Quaheem]'s family" "talking about the jury."[1] App. 198-99. In particular, Thorpe stated that she felt "a little scared" because the group, which included Johnson, said "the Prosecutor doing all this stuff for the jury and it's not even cute." App. 199. The trial judge immediately excused Thorpe, stating "it's clearly jury intimidation." App. 202-03.

After dismissing Thorpe, the trial judge interviewed every juror individually to determine whether any of the other jurors had been compromised. Andre Heun, one of the jurors, indicated that Thorpe had been saying for a few days that she "was worried about the guys that were sitting in the back." App. 210. Heun stated that, when the jury was in the McDonald's, the group of guys was "talking very loud," "saying something

---

[1] Hereinafter, the "McDonald's incident."

3

about the jurors." App. 211. Heun further noted that "the whole jury itself ha[d] actually noticed those guys" and that "they're a little creepy looking." App. 212. He assured the trial court that he could remain an impartial juror.

The trial judge replaced Thorpe with an alternate juror, and the trial continued. The following day, however, Heun suffered a heart attack and had to be excused. He was replaced with the remaining alternate juror, Jaime Medina.

Shortly thereafter, Medina was also excused because he wrote the trial judge a note stating that his family's life was being threatened. Afterwards, in the trial judge's chambers, Medina said he "was nervous [about] being on this case because [he] live[s] across the street." App. 245. He told the trial judge that, the day before, he had walked home and was in front of his house speaking to his father, when someone, whom he suspected to be Quaheem's brother, accompanied by two male companions, walked by him. One of the friends looked at him with a smile—"not a threatening smile, but [an] acknowledgment smile that he kn[e]w[ ] who" Medina was.[2] App. 244-45. Medina then explained to the trial judge that the path to the "Projects" is next to his house, but that "it is just too close of a coincidence th[o]se guys walked by [his] house." App. 246. He then told the trial judge that the event would impact his decision because he could run into Quaheem's friends or family members in the street. The trial judge excused Medina, and declared a mistrial.

---

[2] Hereinafter, the "Medina incident."

After speaking with the assistant prosecutor that handled Quaheem's trial and learning of the mistrial, Appellees Stith and Matos began investigating the two incidents that precipitated the mistrial—the McDonald's incident and the Medina incident.[3] At the time, Stith was a Lieutenant in charge of the Gang Task Force in the Hudson County Prosecutor's Office, and Matos was a Hudson County Jail employee on loan to the Gang Task Force.

Stith and Matos interviewed Medina on May 5, 2011. According to the report, during Quaheem's trial, Medina feared for his safety and asked for a police escort home. He reportedly stated that he "felt uncomfortable throughout the trial because three (3) black males that attended the trial kept giving jurors hard stares," and that he believed one of the males was related to Quaheem because both men looked alike. App. 253. Medina also stated that he felt scared because two days before the interview he was conversing with his father when the three men "that he felt intimidated by in the trial, walked passed him (Mr. Medina) and his father." App. 253. Lastly, Medina said one of the men gave him a "sinister look," and he therefore "felt scared to the point that he ha[d] not slept since the incident." App. 253.

The next day, Matos interviewed Heun regarding the McDonald's incident. Matos learned that Heun was standing behind three young black men when he heard one of them say very loudly, "That [expletive] judge and that [expletive] jury think this is a

---

[3] The investigatory interviews of the jurors conducted by Appellees Stith and Matos, discussed *infra*, were memorialized in reports which are part of the record.

[expletive] game! This ain't no [expletive] game!" App. 256. As a result, Heun reportedly felt threatened. Heun noted that he "strongly believes that the man who made the statement is [Quaheem]'s brother because the man looks so much like [him]." App. 256. Also, he mentioned that "the men went into the dining room to the left of the front counter and continued making the same intimidating statements over and over again." App. 256. Heun also "said that he felt uncomfortable during the trial because the three men . . . were giving the jurors hard looks throughout the trial." App. 256.

On May 9, 2011, Stith interviewed Thorpe. Thorpe had asked to be excused from Quaheem's murder trial because of the McDonald's incident. Specifically, when she and the other jurors went to lunch at the McDonald's, and while ordering food, Quaheem's "brother and two unidentified black males were using profane language and making comments about the jurors, prosecutor and judge." App. 258. Although Thorpe could not recall exactly what was said, she did leave after receiving her food because she felt threatened, and requested a meeting with the trial judge on the following day.

The following week, Matos interviewed Heun for a second time after receiving muted video surveillance of the McDonald's incident from the restaurant. "Heun agreed to view the video and identify the individuals that threaten[ed] the jurors" at McDonald's. App. 260. As Heun watched the video, "he immediately pointed out the man he called, '[Quaheem]'s brother' and two unidentified black males on the video," and provided Matos with "his version of the events." App. 260. He stated that, as the jurors were ordering food, "'[Quaheem]'s brother' and two black males were in line in front of him"

6

and that they "stated loudly that 'the prosecutor and jurors think this is a [expletive] joke.'" App. 260. Consequently, Heun and the other jurors became "very uncomfortable." App. 260. The report further states that, "after Johnson and the two black males purchased their food, they sat in the same section of McDonald's with a juror," who "returned to the jury room . . . very upset about the incident." App. 260. Heun also "became ill" while viewing the video and "requested to view the video at a latter [sic] time." App. 260.

Subsequently, on June 3, 2011, Matos obtained a Complaint-Warrant to arrest Johnson for jury tampering in violation of N.J. Stat. Ann. § 2C:29-8a.[4] Besides providing a general description of the alleged crime, the Complaint-Warrant also provides that probable cause was attained by the "trial record of State v. Quaheem

---

[4] The statute provides:

> Any person who, directly or indirectly, corrupts, influences or attempts to corrupt or influence a jury or juror to be more favorable to the one side than to the other by promises, persuasions, entreaties, threats, letters, money, entertainment or other sinister means; or any person who employs any unfair or fraudulent practice, art or contrivance to obtain a verdict, or attempts to instruct a jury or juror beforehand at any place or time, or in any manner or way, except in open court at the trial of the cause, by the strength of the evidence, the arguments of the parties or their counsel, or the opinion or charge of the court is guilty of a crime.
>
> a. Corrupting or influencing a jury is a crime of the first degree if the conduct occurs in connection with an official proceeding . . . and the actor employs force or threat of force[.]

N.J. Stat. Ann. § 2C:29-8.

7

Johnson. Interviewing of jurors and subsequent identification of the defendant." App. 265. Johnson was arrested that same day and charged with one count of jury tampering.[5]

At trial, Matos, Heun, and Medina testified for the government. During Matos's testimony, Johnson's criminal defense counsel stipulated that Johnson was the individual depicted in the soundless footage of the McDonald's incident. At the close of the government's case, defense counsel made a motion to dismiss, which the trial judge denied. The following day, the jury returned a verdict of not guilty and the trial court entered a judgment of acquittal.

Johnson filed a civil complaint against Appellees in New Jersey Superior Court on July 7, 2014. The case was removed to the United States District Court for the District of New Jersey. Johnson filed an amended complaint in February 2015, asserting counts of malicious prosecution under 42 U.S.C. § 1983 and the NJCRA.

Stith then filed a motion to dismiss the amended complaint. The District Court issued an opinion ultimately dismissing Johnson's claims against Stith in his official capacity and all claims against Stith arising from his grand jury and trial testimony. *See Johnson v. Stith (Johnson I)*, No. 14-5032, 2015 WL 4997413, at \*4 (D.N.J. Aug. 20,

---

[5] Johnson was subsequently indicted on December 20, 2011, on first-degree jury tampering charges in violation of N.J. Stat. Ann. § 2C:29-8. The record reflects that Matos conducted a subsequent interview with Heun on October 7, 2011, regarding the McDonald's incident and presented it to the grand jury. We need not consider this evidence because our inquiry only addresses whether there was probable cause to arrest Johnson.

8

2015). The District Court, however, denied the motion to dismiss the malicious prosecution claims against Stith in his individual capacity. *Id.* at \*4–6.

After discovery, Stith and Matos filed motions for summary judgment. On September 18, 2017, the District Court issued an opinion granting the motions. *See Johnson v. Stith (Johnson II)*, No. 14-5032, 2017 WL 4119584, at \*9 (D.N.J. Sept. 18, 2017). Johnson timely appealed to this Court.

## II. Jurisdiction

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

"Our review of the District Court's order granting summary judgment is plenary." *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party is entitled to summary judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III. Discussion

Johnson argues that the District Court erred in holding that Appellees had probable cause to arrest him. He contends that there is a dispute of material fact precluding the

9

grant of summary judgment; specifically, that that District Court made improper factual determinations, and that the District Court improperly held that Appellees had knowledge of the transcripts noting the colloquy between the trial judge and the jurors in the underlying murder trial. Finally, Johnson asserts that the District Court improperly applied the standard for summary judgment by drawing inferences in favor of the movants, rather than the nonmovant. Stith and Matos respond that they had probable cause to arrest Johnson; and, in any event, that they are entitled to qualified immunity.

To prevail on his malicious prosecution claim under § 1983, Johnson must establish that "(1) the defendant[s] initiated a criminal proceeding; (2) the criminal proceeding ended in [his] favor; (3) the defendant[s] initiated the proceeding without probable cause; (4) the defendant[s] acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) [he] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (alterations in original).

The District Court correctly ascertained that summary judgment depended on whether the officers had probable cause to arrest Johnson. Probable cause to arrest "is not a high bar." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). It exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)).

Although probable cause requires more than mere suspicion, it does not mandate the type of evidence needed to sustain a conviction. *See Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010).

"When a police officer does arrest a person without probable cause, the officer may be liable in a civil rights suit for damages." *Orsatti*, 71 F.3d at 483. Nonetheless, a police officer is "entitled to qualified immunity unless their conduct violated a clearly established constitutional right." *Goodwin*, 836 F.3d at 326. Therefore, to determine whether an officer is entitled to qualified immunity, we engage in a two-prong inquiry: "(1) whether the plaintiff has shown the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *Id.* at 327 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)).

Because Johnson was arrested pursuant to a valid warrant, the District Court properly concentrated its probable cause analysis on whether the police officers "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for [the] warrant." *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). If so, we ask whether "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (quoting *Sherwood*, 113 F.3d at 399).

11

The District Court determined that the "prudent course" was to analyze the information available to the officers at the time they applied for the warrant—which was identified as "(1) the 'trial record of State v. Quaheem Johnson'; (2) 'interview[s] of jurors'; and (3) 'identification of the defendant.'" *Johnson II*, 2017 WL 4119584, at *7. In so doing, the District Court, relying on *Dempsey v. Bucknell University*, 834 F.3d 457 (3d Cir. 2016), reconstructed the application for the warrant, as there was no probable cause affidavit in this case, by "excis[ing] the offending inaccuracies and insert[ing] the facts recklessly omitted." *Id.* at *6 (quoting *Dempsey*, 834 F.3d at 470).

The District Court noted that Johnson took issue with three allegedly false statements contained in the reports generated from the officers' interviews with the jurors. The first discrepancy was in Medina's interview, where it states that the individual in front of his house gave him a "sinister look;" Medina's testimony, however, recognizes that the man gave him an "acknowledgement smile." *Johnson II*, 2017 WL 4119584, at *7. Second, the May 9, 2011 report which stated that Heun detailed how Johnson and the group of men went to the dining room and continued making "the same intimidating statements over and over again," when, on other occasions, Heun indicated that he could not hear Johnson or the group talking loudly. *Id.* Finally, Johnson alleged that Medina never told Matos that the group of men gave him "hard stares" during the trial, as memorialized in the report, because his later deposition testimony reflected that he never told anyone that Johnson stared at him in such a manner throughout trial. *Id.* The District Court concluded that, even assuming that the three statements were

12

fabricated, "the remaining non-fabricated evidence was nonetheless sufficient" to give the officers probable cause to arrest Johnson for jury tampering. *Id.*

We agree. In these circumstances, our review of the record is to "ensure that the proper procedure for determining probable cause was followed," and not that of the "Monday morning quarterback" with the benefit of hindsight. *Dempsey*, 834 F.3d at 469. Here, after meeting with prosecutors regarding Quaheem's mistrial, the officers contacted a confidential informant who identified Johnson as the man being referred to as "Quaheem's brother." Learning that Johnson's uncle, Quaheem, was the defendant in the murder trial, it was reasonable for the officers to believe that his conduct at trial and during the McDonald's and Medina incidents was not coincidence, but rather a manifestation of his nefarious intent to "directly or indirectly, corrupt[ ], influence[ ] or attempt[ ] to corrupt or influence a jury or juror to be more favorable to" his family member. N.J. Stat. Ann. § 2C:29-8. With this information, it was also reasonable for the officers to interview the jurors and gather information to determine whether probable cause existed to arrest Johnson for jury tampering.

The record reflects that the jurors in the murder trial felt intimidated on several occasions. Thorpe told the trial judge that she was "scared for [her] family and [her]self" after the McDonald's incident. App. 196. Accordingly, the trial judge immediately excused Thorpe, and stated that it was "clearly jury intimidation." App. 202-03. The McDonald's incident was corroborated by Heun when he told the trial judge that he heard the group of men talking loudly in the McDonald's and that Thorpe had told him she was

13

troubled by the group of men. Further, Heun stated that the whole jury had "noticed the guys," and that they were "creepy looking." App. 212. Moreover, a week after Thorpe was excused, Medina wrote the trial judge a note concerning his family's life being threatened after Johnson walked by his house and one of his friends gave him an "acknowledgement smile," which caused Medina's dismissal and the mistrial.

Furthermore, the interviews conducted by the officers further corroborated the events precipitating the mistrial. Indeed, each report provided the same general synopsis of the McDonald's and Medina incidents. The record indicates that the interviewees described the fear they felt because of Johnson's actions; in particular, Heun had a visceral reaction to viewing the surveillance video—he became ill and requested to watch the footage at a later time. Finally, the officers confirmed Johnson's identity with a confidential informant who confirmed being unaware of Quaheem having a brother but that Quaheem has a nephew named Dontae Johnson that "looks exactly like him." App. 263.

This evidence, which was not disputed, provides overwhelming support that it was reasonable for the officers to believe that probable cause existed to believe that Johnson had "directly or indirectly, corrupt[ed], influence[d] or attempt[ed] to corrupt or influence a jury or juror to be more favorable to the one side than to the other." N.J. Stat. Ann. § 2C:29-8.

14

Having determined that, notwithstanding the three discrepancies in the reports, there existed overwhelming evidence to conclude that the officers had probable cause to arrest Johnson, his substantive malicious prosecution claims fail on the merits.[6]

## IV.    Conclusion

For the foregoing reasons, we shall affirm the order of the District Court.

---

[6] Because his substantive claims fail on the merits, we decline to address Johnson's alternative arguments that the District Court made improper factual determinations, improperly applied the standard of summary judgment, and improperly held that Appellees had knowledge of the transcripts noting the colloquy between the trial judge and the jurors in Quaheem's murder trial. For similar reasons, we need not address the officers' qualified immunity argument.