**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1031
_____

QING QIN,
                    Appellant

v.

VERTEX, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-20-cv-02423)
District Judge: Honorable John M. Younge
_____

Argued March 5, 2024

(Filed: May 2, 2024)

Before: SHWARTZ, RENDELL, and AMBRO, *Circuit
Judges.*

Ian M. Bryson [ARGUED]
Derek Smith Law Group

1835 Market Street
Suite 2950
Philadelphia, PA 19103

*Counsel for Appellant*

Georgina Yeomans [ARGUED]
Equal Employment Opportunity Commission
Office of General Counsel
131 M Street NE
Washington, DC 20507

*Counsel for Amicus Appellant*

Tanner McCarron
William J. Simmons [ARGUED]
Littler Mendelson
1601 Cherry Street
Three Parkway, Suite 1400
Philadelphia, PA 19102

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**RENDELL**, *Circuit Judge*.

Plaintiff-Appellant Qing Qin is Chinese. He alleges he was denied a promotion and wrongfully terminated from his position as a software architect based on his race and national

2

origin and was retaliated against for complaining about that discrimination. He also alleges that he was subject to a hostile work environment. The District Court granted summary judgment in favor of Defendant-Appellee Vertex, Inc. (Vertex) on all claims.

We will not disturb the District Court's order regarding the hostile work environment claim. However, because the District Court misapplied the *McDonnell Douglas* burden-shifting test and ignored certain evidence favorable to Qin, we will vacate the remainder of the order regarding Qin's failure to promote, wrongful termination, and retaliation claims and remand for those claims to proceed to trial.

## I.

Qin is a software engineer, having earned his Ph.D. in engineering from the University of Pennsylvania, a Chartered Financial Analyst designation, a Finance-Accounting Certificate from the Wharton School, and advanced tax and accounting certificates from the National Tax Institute of SAT of China. He first came to the United States in 1985 from China, his birthplace. Qin worked as an Enterprise Software Architect at Vertex from October 2000 until Vertex terminated him on May 16, 2019.

## A.

Vertex is a software company that develops and sells corporate tax technology. Its software architects are ranked at three seniority levels: enterprise (entry-level) architect, senior architect, and principal architect. It typically took about eight years for an entry-level architect to be promoted to a senior

architect and another six years to be promoted from senior architect to principal architect. Qin was never promoted, and thus spent nearly nineteen years as an entry-level architect despite having the highest education level in Vertex's architecture group.

Before 2018, Vertex operated under a decentralized and non-traditional management model it called the "Advantage Vertex Model" (AV Model). Appx0111. Under this management model, employees could select any colleague—even one whom did not manage or direct the employee's day-to-day work—as a "sponsor"; these sponsors submitted promotion requests, delivered performance reviews, and set yearly goals. In 2018, it began to move away from this style of management to the "Zone to Win" model, a more traditional, results-oriented management structure that emphasized concrete deliverables and accountability. Appx0111. Under this model, department supervisors played a larger role in assigning ratings to employees for their annual performance reviews.

Under this new structure, Vertex would perform yearly evaluations that ran from early November to early February. For their yearly evaluations, Vertex employees were asked to choose three to five people to provide feedback on their review. Those reviewers would submit their comments, after which a supervisor would provide overarching feedback and a rating. Finally, a "calibration team" reviewed and potentially adjusted the rating, which was then conveyed to the employee no later than early February. Promotion decisions were based on this evaluation and calibration process.

4

B.

Qin was the only Chinese employee among Vertex's seventeen software architects, and he alleges that on several occasions, he was called "China Man" to his face by various coworkers. Appx0772, 0822, 0926, 1078. He cannot recall who called him "China Man," why they did so, or the surrounding context. He also alleges that after suggesting Vertex try something based on a new technology that had originated in China, a coworker replied, "Why don't you go back to China?" Appx0822, 0926.

Qin requested a promotion from entry-level to senior architect in or around 2004. He never received a formal decision or explanation regarding the status of this promotion request. In 2015, even though Qin was evaluated and determined to have met every item of the job description of his target promotion position of senior architect and was recommended for promotion, he was again passed over for promotion.

In the later years of his employment with Vertex, Qin spent substantial time working on exploratory work. In 2014, Rick Harter, Qin's manager, emailed Qin saying, "We need to get you more involved in opportunities where your ideas can get implemented. You will also have to jump into some work that is more related to the needs as expressed by the strategy teams . . . ." Appx0497. However, Qin continued to work on informal, exploratory projects, including the "PAM Library," which Vertex states he continued to work on for over a year after learning that it was not a viable offering for Vertex. For his part, Qin denies working on the PAM Library after he learned Vertex would not be pursuing it.

5

## C.

In February 2018, Harter agreed to recommend Qin for a promotion at the end of 2018 provided he met his yearly goals. That October, Ed Read, Vertex's Finance Director and Qin's sponsor, recommended Qin for promotion to senior architect. That same month, Qin—who had not been told about that recommendation—asked Harter whether he had not yet been promoted because he was Chinese. Harter answered no and referred Qin to Human Resources. In November, Harter signed off on the promotion form.

On December 13, 2018, Qin met with Andrea Falco in Vertex's Human Resources department to inquire about the company's procedures for reporting discrimination and harassment. Qin denied that he had anything to report. Falco then shared with others, including Nicole Sakowitz (another Human Resources employee and decisionmaker on Qin's performance evaluation), that Qin had come to her office to ask about discrimination reporting procedures.

On December 14, 2018, Jen Kurtz, Vertex's Chief Technology Officer and the individual responsible for approving promotions, reached out to Harter regarding the promotion and expressed doubt regarding the basis for the promotion. Harter told Kurtz that Qin "has accomplished the goals that Ed [Read] and I set for him earlier in the year," but the reviews coming in for Qin's yearly evaluation were making him rethink the promotion. Appx1274. Harter agreed with Kurtz's plan to defer the promotion decision until after the yearly-review calibration process and reassess next steps for Qin in the new year.

6

D.

After receiving evaluations from reviewers, managers were able to assign employees ratings based on those reviews and their experience with the employee. At that time, Harter assigned Qin a "Strong Contributor" rating. Appx0296. The calibration process then began. The team that evaluated Qin's review was Kurtz, Lois Reynolds (Program Management Director), Norm Stahlheber (Director of Software Development), Sakowitz, and Falco. It was during this time that the calibration team, in conjunction with Harter, changed Qin's "Strong Contributor" rating to a "Usually Meets Expectations" rating, which Vertex considers a poor rating. Appx0790. In their depositions, some members of the team said this revised rating resulted from Qin's struggle to engage in formal projects, while Harter said that it was based, in part, on a negative review from John Hart, a peer whom Qin requested participate in his yearly review.

The comment from Hart reads as follows:

> I truly like Qin as a person but I have come to be very disappointed by his general passivity. He generally takes an excessive amount of time to accomplish tasks, and is overly reliant upon others for direction. Within the AV model he had no idea regarding how decisions were made and seemed to have very little interest (or ability) to build relationships to help him establish a role within the

organization where he could be effective (essentially, he's been in semi-hiding for years – in spite of the fact that he seems to want to work on something meaningful). I think he is an intelligent person, but his historical relationship with Vertex has set him into behavioral patterns that are not in alignment with the Winning Way (while he wants decisions to be made, he is unable to achieve alignment within the team to make a decision and he is extremely reluctant to be the one who makes the decision to the point that he uncomfortably laughs and physically recoils when it is suggested that he take ownership (he clearly sees doing so as a risky thing to do) – this behavior fails both the Winning Way "Own the Outcome" and "Drive to Decision" goals… By being so passive and therefore unable to drive to decisions and ultimately not willing to own outcomes[,] [he] limits his ability to "Act with Urgency" because the priority is always on not taking a risk and instead waiting for others to realize that he needs their participation to move anything forward)… If he doesn't take ownership of his role

and establish strong relationships within the Zone to Win model[,] I don't see his role as viable within Vertex. My concern being that he simply doesn't have the skill, personality, or sufficient backing of a leader within the organization for him to become a more dynamic individual who delivers high-value work products on a weekly basis…

Appx0955-56. All other comments were generally positive.[1]

On February 8, 2019, Qin received his 2018 performance evaluation. Following his negative evaluation, Vertex gave Qin the option either to undertake a Performance Improvement Plan (PIP) or accept termination with a severance package of twenty-six weeks' pay and benefits. Qin selected and began drafting the PIP. Vertex claimed the PIP was necessary due to his poor performance rating of "Usually Meets Expectations." Appx0282-83.

Qin interviewed each of his performance reviewers to understand and define his performance improvement

---

[1] *See, e.g.*, Appx1136 ("QinQing is an exceptional talent and his insights and analytical skills can be greatly leveraged in the company"); Appx1135 ("QingQin is very determined, detail orientated [sic] and focused on meeting the objectives he sets out to accomplish. When communicating his plans for something he is very comprehensive and incorporates in the feedback of others to ensure a complete view of perspectives.").

9

objectives. When Qin interviewed Hart, Hart told him the negative comments were due to "cultural differences." Appx0823, 1128-29, 1145-46. Qin understood this to mean that Hart's review was based on negative stereotypes of Chinese individuals. Hart contends that he was referring to the cultural shift Vertex was undergoing at the time and testified that he told Qin to look at factors including "[his] cultural background, how [he] grew up" and consider whether "they make [him] fit or not fit within Vertex." Appx1146.

E.

On March 31, 2019, Qin had reported to Falco that he believed Hart's review comment was racially motivated. The next day, he explained the specific details of the discriminatory comment. He told Falco the review was

> full of negative opinions with no factual basis, and they are not true in describing my behavior and performance at Vertex. Rather, the [review] is full of descriptions of a stereotypical Chinese, e.g., lacking social skills ("uncomfortable laughs", etc.), needing guidance/less autonomous ("general passivity", "overly reliant upon others for direction", etc.).

Appx1126. Qin met with Falco on April 12, 2019, to discuss the details of his allegations regarding the discriminatory review. Falco also interviewed Hart regarding the comment.

10

After conducting both interviews, Falco concluded that while she believed Hart did not intend the comments to be racially or culturally insensitive, Qin interpreted them that way. In her deposition, Falco did not concede that the comments were discriminatory; rather, she admitted only that "they were inappropriate." Appx1002. When asked whether the comments were "racially or culturally insensitive," Falco testified that she believed "Qin interpreted them that way, and I think he's well within his rights to do that." Appx1002. Ultimately, Falco testified that HR agreed to remove the comments because they were inappropriate, because Hart should not have been a commenter on Qin's review, and because Qin felt they were discriminatory. She concluded the HR investigation and agreed to remove Hart's evaluation completely from the 2018 performance review. Even with Hart's comments removed, Qin's rating remained a "Usually Meets Expectations," and Vertex did not revisit the decision to place Qin on a PIP.

F.

When drafting his PIP, Qin identified four objectives that would allow him to accomplish the PIP. The fourth, which would enable Qin to satisfy the PIP if he "s[ought] [a] contribution opportunity for any other initiatives supporting Vertex Enterprise Objectives," was removed by Vertex in the final PIP. Appx0715. Qin joined the Excise Tax Project, which he testified would have satisfied this fourth objective in his draft PIP that was later removed.

In his final PIP, Qin identified "barriers to success" that included being "[u]nable to identify decision makers for all items" and being "[u]nable to access the decision makers and

11

stakeholders to learn potential opportunities and present my relevant knowledge and experience." Appx1123. Qin and Vertex signed his PIP, and he was formally placed on it on April 2, 2019. It gave Qin until May 3 to meet any one of three identified performance goals.

As he identified in his PIP, Qin had difficulty finding projects with decisionmakers who had the authority to permit him to join the project, and his PIP was extended for two weeks. Qin testified in a declaration that he reached out to multiple managers and decisionmakers who could empower him to complete any of the PIP objectives, and he did not hear back from any of them. When Qin did not meet any of the PIP goals by the extended deadline, Falco and Stahlheber, who had assumed Qin's management, decided to terminate him on May 16, 2019.

For that same evaluation period, another employee in the architect group, Fred Yawe, whom Harter also supervised, was given a "Usually Meets Expectations" rating. Appx0792, 1052. Yawe's performance review identified that he "[was] not engaged or lack[ed] follow up." Appx0793. Yawe, however, was not put on a PIP or terminated. He is not Chinese. Yawe had just joined Vertex that year, and Vertex urges that he was contributing to Vertex's flagship cloud product and was not promoted.

Qin filed his complaint alleging race and national origin discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* Specifically, he alleged that Vertex did not promote him and eventually terminated him because of his Chinese

12

nationality and/or in retaliation for engaging in protected activity. He also alleged he was subject to a racially hostile work environment. The District Court granted summary judgment to Vertex on all Qin's claims. He timely appealed.

II.

The District Court had jurisdiction over this matter under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C § 1367. We have jurisdiction under 28 U.S.C. § 1291.

When reviewing a district court's grant of summary judgment, our review is plenary, and we apply the same standard as the District Court. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015). Under that standard, summary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. *Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017); Fed. R. Civ. P. 56(a). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (quotation omitted). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

III.

A brief discussion of the District Court's opinion is apt here to inform our analysis. Vertex moved for summary judgment on all Qin's claims, which the District Court granted

13

in full. Regarding Qin's hostile work environment claim, the District Court found that the alleged comments were "offhanded and isolated" and thus "not sufficient to establish a hostile work environment claim." *Qin v. Vertex, Inc.*, No. CV 20-2423-JMY, 2022 WL 10493574, at *5 (E.D. Pa. Oct. 18, 2022).

Regarding Qin's discrimination claims, the District Court concluded that Qin's direct evidence of discrimination—*i.e.*, comments from coworkers calling him "China Man," asking him to go back where he came from, and explaining that a negative review stemmed from "cultural differences"—amounted only to "stray remarks" and thus were not direct evidence of discrimination. *Id.* at *3. It also concluded that, under the *McDonnell Douglas* framework for analyzing circumstantial evidence of discrimination, Qin failed to present a prima facie case that would shift the burden to Vertex to provide a legitimate reason for denying Qin a promotion and terminating him. *Id.* The Court explained that Qin both failed to provide evidence that Vertex sought applications for the senior architect position and that the position remained open or was filled by someone else, *id.*, and "failed to provide evidence [of a comparator] which would allow this Court to infer discrimination," *id.* And even if Qin had made his prima facie case, the Court found that Vertex offered "legitimate, non-discriminatory reasons for not promoting [Qin] and for terminating his employment," crediting Vertex's explanations that Qin "failed to engage in formalized Vertex initiatives and projects" and failed to satisfactorily complete his PIP. *Id.* at *4.

Analyzing Qin's retaliation claims, the District Court first found that Qin's inquiry to Harter about whether he had not been promoted because of his race and his inquiry to Falco about reporting procedures were not protected activity that

14

"rise to the level of informal complaints or protests [or] state opposition to unlawful discrimination in a clear and unequivocal manner." *Id.* at *6. Then, the Court concluded that anything beyond a three-week time frame was too attenuated to suggest a causal relationship and thus concluded that Qin's March 31 complaint was too far removed from his termination to support an inference of retaliation. *Id.* at *7. Finally, the Court briefly noted that if it were to undertake a *McDonnell Douglas* analysis, Vertex indeed provided a "plausible and consistent explanation for both the lack of promotion and subsequent termination." *Id.*

IV.

Because we agree with the District Court that Qin did not present evidence to demonstrate a sufficiently severe and pervasive hostile work environment, we will affirm summary judgment in favor of Vertex on that claim. However, Qin presented evidence that would give rise to an inference of discrimination and presented comparator evidence that would allow a reasonable jury to determine Vertex's reasons for denying promotion and termination were pretextual. Further, the evidence and timeline of his protected activity are sufficient to find causation on his retaliation claims under our precedent. Accordingly, we will vacate the District Court's order on his discrimination and retaliation claims.

We examine Qin's Title VII, § 1981, and PHRA claims together because they fall under the same analytical framework.[2]

---

[2] *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively

A. Hostile Work Environment Claim

Qin alleged that he suffered a hostile work environment. He points to three comments that he alleges created a hostile work environment over the course of his nearly two decades of employment: (1) Hart's review and later verbal comment that the review stemmed from "cultural differences,"[3] Appx1128-29, 1145-46; (2) a comment from coworker Robert Norton asking, "why don't you go back to China if the technology is so advanced?", Appx0444; and, (3) the "China Man" comments Qin heard at an unspecified time by unidentified speakers at Vertex, Appx0245-46, 0444-45. Additionally, Qin insists in his Opening Brief that we must consider these comments in context—he was the only Chinese employee in his group and was never promoted during his time at Vertex. Br. of Appellant 33-35.

We "concentrate not on individual incidents, but on the overall scenario," when analyzing a hostile work environment claim. *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005). The Supreme Court has taught that we are to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

with Title VII claims."); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (explaining that actions brought under § 1981 require the same elements of proof as a Title VII action).

[3] Although, in his opening brief, Qin does not explicit rely on the "cultural differences" argument to support his hostile work environment claim, we will consider this comment for the sake of completeness. *See* Br. of Appellant 33-35.

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

In considering the severity of the discriminatory conduct, we look to whether the conduct creates "an attitude of prejudice that injects hostility and abuse into the working environment." *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (quoting *Taylor v. Metzger*, 706 A.2d 685, 693 (N.J. 1998)). Although the remarks Qin endured were offensive, they do not rise to the level of severity that would alter working conditions. *Compare id.* (holding that obviously racial comments, including being greeted with "Hey Arabia Nights" or "Hey, Big Egypt" and condescending questions about technology in the plaintiff's home country, were not so severe as to make a hostile work environment) *with Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) (holding that the use of an unambiguous racial epithet by a supervisor, immediately followed by a threat of termination, created a hostile work environment). None of the remarks here were severe enough to create a hostile work environment.

We must also look to the frequency of the conduct in the context of the case. *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023); *Harris*, 510 U.S. at 23. Here, three comments over the course of almost nineteen years simply do not reach the requisite level of frequency or severity. *See, e.g.*, *Nitkin*, 67 F.4th at 571 (determining that seven comments over three-and-a-half years were neither severe nor pervasive enough to constitute a hostile work environment). The comments here were too infrequent to constitute pervasive harassment.

17

Finally, we consider whether the alleged discrimination was physically threatening, humiliating, or unreasonably interfered with the plaintiff's work performance. *Harris*, 510 U.S. at 23. Qin provided no evidence that would allow us to find a hostile work environment existed on these bases.

The handful of isolated comments presented over Qin's nearly two decades at Vertex is not enough for a reasonable jury to conclude that Qin was subjected to a hostile work environment. We thus agree with the District Court; this claim was properly dismissed.

## B. Discrimination Claims

Qin alleges that he was discriminated against based on his race and national origin when he was denied a promotion and terminated. The District Court concluded that he did not present direct evidence of discrimination or present a prima facie case under the *McDonnell Douglas* pretext analysis for either his failure to promote or his termination claim.[4] Qin disagrees with the District Court's reasoning at all steps of the disparate treatment analysis. While we agree with the District Court that Qin has not presented direct evidence of disparate treatment, we find that he has presented sufficient evidence to support a prima facie case of discrimination through circumstantial evidence.

---

[4] Much of the evidence and argument for Qin's failure to promote and termination claims overlap. We address the claims together here and distinguish them when relevant, both in this discrimination analysis and in the retaliation analysis *infra*.

18

"A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990). For a successful disparate treatment claim, "proof of the employer's discriminatory motive is critical." *Id.* There are two ways to show discriminatory intent: (1) direct evidence or (2) circumstantial evidence. *Id.*

1.

Direct evidence of disparate treatment is evidence that "is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case [as is necessary in a pretext action] to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995) (cleaned up). In other words, the evidence must be such that it demonstrates that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). This is a "high hurdle." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002). Discriminatory statements constitute direct evidence of discrimination where there is evidence linking the speaker to the employer's adverse employment action. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 515-16 (3d Cir. 1997).

Qin points to the following "direct" evidence: He was placed on a PIP because of Hart's review comments and when confronted, Hart explained that these comments were based on "cultural differences." Appx0823. Thus, Qin's negative

19

performance review, lack of promotion, and subsequent PIP and termination were based not on his work, but on his race and national origin.

We agree with the District Court that Qin's "direct" evidence is insufficient. Hart was not a decisionmaker, and his comment about "cultural differences" was not known to the decisionmakers at the time Qin was denied promotion or terminated. *See Walden*, 126 F.3d at 516; *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring) ("Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard."). Because Qin has not provided direct evidence of discrimination, we next look to his circumstantial evidence of discrimination.

2.

In the absence of direct evidence of disparate treatment, the *McDonnell Douglas* burden-shifting framework applies. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Under this framework, the plaintiff must "establish a prima facie case of discrimination by showing that: (1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) *the action occurred under circumstances that could give rise to an inference of intentional discrimination*." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802) (emphasis added). However, the Supreme Court has cautioned that the *McDonnell Douglas* framework "is an evidentiary standard, not a pleading requirement," and

20

was "never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 512 (2002) (internal quotation marks and citation omitted).

The District Court incorrectly analyzed the fourth *McDonnell Douglas* factor in both Qin's failure to promote claim and his termination claim, and we address them in turn.

i. Failure to Promote Claim

The District Court correctly recited the more flexible approach to the *McDonnell Douglas* framework for the prima facie case. But it applied it too narrowly. In analyzing Qin's failure to promote claim, the District Court required Qin to show that he applied to an open position and was rejected, and that the position remained open or was filled by someone else who was chosen over him. *Qin*, 2022 WL 10493574, at *3. Because there was no evidence that Vertex even sought applicants for the Senior Architect position—rather, Qin requested a promotion—the Court held that he could not make out the prima facie case. *Id.*

The District Court should have considered the fourth *McDonnell Douglas* factor: that is, whether the action, taken together with the circumstances, "could give rise to an inference of intentional discrimination." *Makky*, 541 F.3d at 214. And here, we conclude that it could. Qin presented evidence that, on average, entry-level architects were promoted to senior architects after about eight years, and then promoted again after about six more years. Qin, the only Chinese employee in the architecture group, was never promoted in his nearly nineteen-year tenure. Qin also presented evidence that he was on track for promotion in 2018, and that supervisors at

21

Vertex had expressed a need for senior architects and senior-level work. And he presented evidence from which a jury could reasonably infer that part of the reason Qin was not promoted in 2018 was Hart's negative review. *See* Appx1284 (showing that Harter did an about-face regarding Qin's promotion: "I'm starting to feel uncomfortable about some of the issues (minor though they are) that have showed up in his review.").

While Vertex did not seek applicants for a senior architect role, "the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *Metal Serv. Co.*, 892 F.2d at 348. Vertex has presented no evidence that it sought external applicants for senior roles, and Qin presented ample evidence that he conveyed his interest in a promotion to Vertex. We conclude that he has successfully presented a prima facie case for his failure to promote claim.

## ii. Termination Claim

Regarding his termination claim, the District Court correctly explained that Qin could establish an inference of discrimination by "demonstrat[ing] that similarly-situated persons outside the protected class were treated more favorably." *Qin*, 2022 WL 10493574, at *3 (alteration in original) (citing *Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017), *aff'd*, 708 F. App'x 48 (3d. Cir. 2017)). However, it found that Qin failed to present a similarly situated employee. We disagree. The Court failed to analyze or even mention Qin's comparator evidence showing that his non-Chinese co-worker Yawe was treated more

22

favorably during the 2018 performance review cycle.

We have adopted the standard used by other circuits that comparator employees need not be identical but must be similarly situated in "all material respects." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (citation omitted); *see also Russell v. University of Toledo*, 537 F.3d 596 (6th Cir. 2008); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-61 (5th Cir. 2009). Factors that are relevant include whether the employees dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities. *In re Tribune Media Co.*, 902 F.3d at 403; *see also Lee*, 574 F.3d at 259-61; *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). An employee who holds a different job title or works in a different department is not similarly situated. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013).

Here, Qin presented Yawe as a comparator. In all "material respects," Yawe and Qin are similar. Both men were architects supervised by Harter. They were both initially given "Usually Meets Expectations" reviews at the end of the evaluation period, and both men's reviews reflected a lack of engagement. However, Yawe's Performance Review was upwardly adjusted, and he was not put on a PIP or terminated. Vertex attempts to limit who can be considered a similarly situated employee and insists on too narrow a definition: it points to Yawe's assignment on the cloud product and his short tenure at the company rather than his position, supervisor, and job responsibilities. These differences are immaterial for the purpose of establishing a prima facie case. In all material respects, Yawe is an appropriate comparator.

3.

Once Qin established a prima facie case of discrimination, the burden shifted to Vertex to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Makky*, 541 F.3d at 214. The District Court was correct in finding Vertex did so here: Vertex explained that it did not promote Qin because he failed to engage in formalized Vertex initiatives and instead spent time on exploratory projects and projects he knew were not going to be adopted by the company. And as for his termination claim, Vertex explained that Qin was terminated because he failed to satisfactorily complete his PIP.

After Vertex provided a legitimate, non-discriminatory reason for denying Qin a promotion and later terminating him, the burden shifted back to Qin to show that "the defendant's proffered reason is merely pretext for intentional discrimination." *Makky*, 541 F.3d at 214. To establish pretext, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff can satisfy the second prong by demonstrating, among other things, that "the employer treated other, similarly situated persons not of his protected class more favorably." *Id.* at 765.

We will examine how the pretext analysis should play out. If there was nothing from which a jury could infer Vertex's proffered reason to be pretextual, we would affirm the

24

dismissal of claim. However, Qin presented sufficient evidence to allow a reasonable jury to draw an inference of pretext from the following: First, regarding the evaluation process, there is a question of material fact as to the reason for the "Usually Meets Expectations" evaluation. Falco and Stahlheber explained that the calibration team took all the feedback Qin received into account before lowering his evaluation to "Usually Meets Expectations," but conflicting testimony shows that Hart's comment was the main reason Qin received a "Usually Meets Expectations" rating. Second, he had performed satisfactorily for the company for eighteen years, then suddenly when he was up for a promotion, he was placed on a PIP and ultimately fired. Third, Qin presented comparator evidence, which the District Court did not address. Fourth, Qin presented evidence of Hart's explanation that his review was based on "cultural differences" and Hart's strained explanation of what that means. And fifth, Qin presented evidence regarding intentionally imposed barriers that prevented him from successfully completing his PIP.

This, among other evidence, would permit a jury to find pretext. Accordingly, we will vacate the District Court's grant of summary judgment on Qin's discrimination claims.

## C. Retaliation Claim

Qin alleges that he was not promoted and that he was terminated in retaliation for engaging in protected activity. He alleges that he engaged in three forms of protected activity: (1) asking his manager in October 2018 whether he had not been promoted because he is Chinese; (2) asking Human Resources about Vertex's discrimination reporting procedures; and (3) complaining that his negative performance review included

25

stereotypical generalizations of Chinese men that were discriminatory, baseless, and false. To establish a prima facie case for retaliation, Qin needed to show: "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action." *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995).

The District Court concluded that only Qin's submission of a complaint of stereotyping constituted protected activity and that he failed to show a causal connection between that protected activity and the alleged retaliation. *Qin*, 2022 WL 10493574, at *7. We agree that Qin's submission of a complaint of stereotyping constituted protected activity and that his inquiry into reporting procedures did not.[5] However, regarding Qin's question to Harter about whether he had not been promoted due to being Chinese, we disagree with the District Court and conclude that was protected activity.

i.

Qin's October 2018 question to Harter was protected conduct. Title VII protects "those who oppose discrimination

---

[5] We agree with the District Court that Qin's December 2018 request to Falco about Vertex's reporting procedures is not protected activity. When asking Falco about how to make a complaint about discrimination, Qin did not make any complaint—explicit or implicit—about discrimination based on a protected characteristic. Thus, this action cannot be viewed as protected conduct.

made unlawful by Title VII." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). Thus, only complaints about discrimination prohibited by Title VII—discrimination based on race, color, religion, sex, or national origin—constitute protected activity. *Barber*, 68 F.3d at 701-02. General complaints of unfair treatment are not. *Id.* at 702. Protected activity can include "informal protests . . . including making complaints to management," but it "must not be equivocal [or vague]." *Moore*, 461 F.3d at 341-43. As relevant here, retaliatory action can also result from an employer's *perception* that an employee is engaging in protected activity. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 572 (3d Cir. 2002).

In October 2018, Qin asked his manager, Harter, if the reason why he had not been promoted was because he is Chinese. To be sure, our precedent requiring opposition to the alleged unlawful conduct "not be equivocal" precludes retaliation claims where the employee fails to communicate to the employer his belief that he suffered discrimination. *Barber*, 68 F.3d at 702 (explaining that a letter expressing dissatisfaction with a lack of promotion but not specifically complaining about or suggesting discrimination is not protected conduct). Qin, however, made an explicit connection between his membership in a protected class and his lack of promotion. Here, there is no meaningful difference between Qin asking, "Am I not being promoted because I'm Chinese?" and Qin saying, "I think I am not being promoted because I'm Chinese." Indeed, in response, Harter referred Qin to Human Resources, clearly understanding that Qin was alluding to discriminatory treatment. It was not vague or equivocal. A jury could readily view this exchange as protected conduct. Harter's response bolsters such a conclusion. *Cf. Fogleman*, 283 F.3d at

27

572 (finding that retaliation can occur following an employer's *perception* that an employee engaged in protected activity).

There can be no argument as to the other protected activity. As the District Court recognized, Qin's complaint regarding stereotyping in his March 31 email clearly satisfies the requirements for protected activity as a clear complaint about discrimination. The only issue that remains is whether there is a sufficient causal link between the protected activity and the retaliatory conduct.

ii.

A reasonable juror could find a causal link between Qin's protected activity and his lack of promotion and termination. "[T]emporal proximity between the protected activity and the termination [can be] itself sufficient to establish a causal link." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)). For temporal proximity to be sufficient on its own, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* But even so, if temporal proximity alone is not enough, we have recognized that "timing plus other evidence may be an appropriate test." *Thomas v. Town of Hammontown*, 351 F.3d 108, 114 (3d Cir. 2003) (quotation omitted). Part of the "timing plus" analysis is whether an adverse employment action took place as early as it could have given an employer's set cycle of employment decisions. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792-93 (3d Cir. 2016).

The District Court's adoption of a rigid three-week time frame as part of the temporal proximity inquiry was a misapplication of the law. In *Moody*, an employee alleged she was retaliated against after she filed a written complaint that she was being sexually harassed by her supervisor. *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 220 (3d Cir. 2017). After she filed her complaint, her hours declined three-fold in the months following. *Id.* While the reduction in hours in *Moody* happened immediately after the protected activity, we explained that the inference of "unduly suggestive" proximity "begins to dissipate where there is a gap of three months or more." *Id.* at 221 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (holding that a gap of three or five months, without more, cannot create an inference of causation)). Here, the Court imposed a shorter "unduly suggestive" time frame, explaining that anything beyond three weeks is too attenuated.[6] Regarding Qin's claim that his termination was retaliatory, Qin complained about the

---

[6] The District Court relies on *Thomas v. Town of Hammonton* to establish its three-week time frame. 351 F.3d 108, 114 (3d Cir. 2003). *Thomas* is distinguishable. First, we relied on the "timing plus" analysis in *Thomas* to determine that, despite a mere three-week gap between the protected activity and the adverse employment action, there could be no inference of causation. *Id.* Rather, in *Thomas* the record supported that the plaintiff was terminated not in retaliation, but after nine days of absences, two of which were unaccounted for, at the end of an agreed-upon probationary period at the beginning of her employment. *Id.* Here, along with the temporal proximity between Qin's complaint to HR and his termination, the record provides that the termination occurred at the end of a known evaluation and PIP cycle and at the first opportunity to terminate Qin.

discrimination in his performance review in an email to Vertex's HR on March 31, 2019. He was terminated six weeks later, on May 16, 2019. This timing is well within the three-month range to be "unusually suggestive of retaliatory motive." *Williams*, 380 F.3d at 760. A jury could find that the proximity between Qin's complaint to HR and his termination is enough to infer causation.

For Qin's claim that he was denied a promotion in retaliation, the District Court should have considered the context surrounding the alleged retaliation. In *Connelly*, the plaintiff alleged that her employer's failure to rehire her in April 2011 was retaliation for making a complaint about sexual harassment in May 2010—nearly a year prior to the decision not to rehire here. 809 F.3d at 792. Despite this gap, we held that the plaintiff had sufficiently pled retaliation given the "seasonal character" of her work: because the employer traditionally hired during construction seasons, "it may be that a retaliatory decision to not rehire her would not become apparent until after the off-season that ran from October 2010 to March 2011." *Id.* Qin's first protected activity—when he asked Harter whether his race was why he had not been promoted—occurred in October 2018 and he was denied a promotion in February 2019. This delay of about four months is indeed outside of the three-month time frame we have identified, beyond which the inference of "unduly suggestive" temporal proximity begins to dissipate. *Moody*, 870 F.3d at 221. However, looking to timing and other evidence is appropriate. Qin asked Harter in October, before the annual review cycle began, whether he had not been promoted because he was Chinese. Then, mid-way through the review cycle and after reviewing Qin's reviewer comments, Harter agreed with Kurtz to hold off on the promotion. In February,

30

Qin did not receive a promotion at the end of the review cycle, when he received his negative evaluation. In the context of Vertex's set evaluation cycle, calibration process, and promotion schedule, Vertex's February 2019 decision not to promote Qin happened at the first promotion opportunity following his protected activity. *Connelly*, 809 F.3d at 792-93. A jury, then, could find a causal connection between Qin's inquiry to Harter and his failure to be promoted.

Accordingly, we will vacate and remand for further proceedings on Qin's retaliation claims.

V.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Vertex on Qin's hostile work environment claim. However, we will vacate the District Court's grant of summary judgment on Qin's disparate treatment and retaliation claims and remand for further proceedings consistent with this opinion.